Case is taken under advisement. All right. Oh my goodness, case number six, 22-1303. Stephen Smith v. Crounse Corporation, and it's Mr. Djokovic. Good morning, Ryan A. Djokovic on behalf of plaintiff appellant Stephen R. Smith. May it please the court. This case involves a maritime tort claim under section 905B of the Longshore Act. Mr. Smith was injured while in the course of his employment with Molzer Crush Stone aboard a barge owned by defendant appellee, Crounse Corporation. And so he had been tasked at that time operating a skid-steer bobcat type machine, and it collided with a part of the barge, a split scene sticking up, but concealed by that cold debris. And so we've been referring to it as a scab or a split scene defect in the pleadings. Crounse filed a motion for summary judgment arguing that Smith could not sustain his burden of proof on the turnover duty. And so that motion was granted. So we've alleged two issues for this appeal. We've stated that the district court erred in applying the wrong standard of governing substantive law to the facts of the case. That's reviewed de novo by this court. We've also said that the court in excluding certain lay testimony regarding the barge condition has abused its discretion over evidentiary matters. So I think the first issue to take up for argument is the legal standard question. We think that the case of Howlett v. Birkdale Shipping, it's a post-Cindy Esteem case. Cindy Esteem creates the three duties, turnover duty is one of those. So the Howlett case explains how to look at the turnover duty, more specifically than Cindy Esteem, which was a duty to intervene case. And so the facts of Howlett are actually kind of the inverse of what we have here. In Howlett, the plaintiff was complaining about a cargo hazard rather than a vessel hazard. Those are the two types of hazards that Howlett identifies. And in Howlett, the plaintiff was trying to get a cargo hazard, which was some plastic that was on the ground that they were interacting with. And he was trying to get that analyzed under the vessel hazard standard. And the court rejected that, the Supreme Court, said that we're not gonna apply the vessel hazard standard to this cargo hazard set of facts. And the rationale was explained, and we've quoted in our brief in detail, is that the vessel has a duty to warn of certain hazards that are arising in the vessel, its equipment, its gear. And implicit in that duty to warn is the duty to inspect. Whereas the cargo hazards, those arise within the cargo stow itself. Those are the province of Estevador, who's apparently expert at unloading and loading cargo. And so we're two separate types of duties for two separate factual constellations. And so in this case, we think that the district court in analyzing this case didn't properly look at the duty to inspect that Crowns Corporation has for its barge that was used in this case. Instead, it was more of kind of the cargo hazard standard that was applied, that there is no duty to inspect, rather that the language of the district court opinion says that Smith provides no evidence that more maintenance was required or recommended. And that's just his personal opinion. But- Council, could you perhaps shed some light on whether the record actually does show why this cleaning operation was delegated to a crew, was pronouncing it right, crews? Crowns Corporation, the, and so- Why was it, why did they engage them to do this rather than do it themselves? Is that right, Sheldon? The corporate deposition of the defendant, there was some discussion of their purpose. And I don't know how much of that made it into the pleadings, but it's my recollection of the rationale is kind of a business type decision that the Crowns would, needed to have the limestone put onto their barge and you know, Moser has limestone. And so I think it was, what happened was they, the coal debris was left in the barge and instead of going to a separate cleaning service, it was, I think, more convenient for Moser just to remove it and then put the limestone in with, I guess, the consideration that they would be able to keep that coal debris and then use it or sell it, is my understanding. Is it in the normal course of business, does a barge company clean its barge after every haul? Or does it, what is the, does the record show what the standard is here? Suppose they will pick it up another load of coal and taking it out. Would they have cleaned the barge before they did? I, you know, I'm sorry. Your Honor, I don't know the exact answer to whether they would clean it for the next coal trip. I don't think they would, but I think they need to clean it off so that it wouldn't be like a cross-contamination with the limestone product that they were having. I can appreciate that, but that would, that makes sense as to why they asked these folks to clean the barge this time. But I just wondered,  between each shipment? I understand what you're saying. And so I'm not sure if it needs to be cleaned between each shipment, but I think if there's a certain inspection regimen that I think the law is gonna require in terms of a regular maintenance. And, you know, and then as far as this particular case where the defendant had testified about how there's a certain amount of wear and tear that causes these split seam defects on a regular basis, they're common occurrences. And that is like a general condition of the barge when they're of a certain age. And this barge fits into that age range. So, you know, we think that there's at the very least a general duty to warn of that general condition. It's something that is a latent hazard to a stebadoring crew coming on to a barge that's covered in coal dust, for instance, but not to the company. And I think it's document 35-3 in the district court has the photograph of the barge. And if I recall the testimony, I think that's kind of the standard appearance of the barge. So I think that they do clean these things off a decent amount and the way the corporate deposition went forward, I think this is in the briefs. Your view is that the barge owner should have in fact expected this barge for this particular defect before that earlier coal shipment. Yes, we think that there should have been something before the coal shipment, definitely to, they don't have a regular inspection regimen. The Cameron case, the Seventh Circuit case, that's where there's a protrusion from a hatch that the longshoreman gets hurt on. And it's three days before that, they actually had kind of a dedicated inspection, very specific and that hadn't showed up. And that in some ways provided to that defendant some respite from the case. It's like you did in fact inspect, but here that's a constructive notice problem. If you haven't inspected at all, you're just relying on your employees during the norm course of their duties to kind of notice things. Does the record, I'm sorry, does the record establish what the industry standard is for inspecting the hold of the ship? On a regular basis, how often this is done? I'm not aware of the record establishing what the industry basis is on. And so I think that we asked those questions, but I don't think we got any kind of answers about what the industry practices or the industry standard is to inspect the barges. It's on the one hand, but on the other hand, the law does suggest that the vessel has a duty to inspect its barges. And I understand that there's a limited amount of time from the time they have it at the coal plant to bring it to Moser's facility. It's like a three hour trip or whatever. That's a limited amount of time. But before that, they hadn't had any type of rigorous inspections. The most rigorous inspection they do is this repair plan, which is every two to three years. And at the time of Mr. Smith's accident in April of 2017, it had been almost 16 months since they had had those repairs done. By the time we get to the July 2017 frame to get repairs done there, there's, I think it's 15 feet of split seams that need repaired. And the barge is coming apart at the seams quite literally, if they've got to repair that many split seams. And that's something we think a proper inspection regimen beforehand would have allowed them to catch and say, hey, this thing is old and has, and it's simple, a simple warning. This thing has split seams on it. You guys got to watch out for that. That warning never occurred. And so we think they violated the turnover duty because they haven't inspected it properly and haven't warned of even the general hazard, which they know has been established. My time is coming to an end. Couldn't that generalized standard have been established by expert testimony under rule 702? The district court docket seemed to indicate there were a number of extensions for the discovery in the expert discovery, but then ultimately the decision came down. And it doesn't appear from the record that there was any expert witness testimony concerning the standard. And Judge, I see my time has expired. With your leave, I'll answer. And so there was no, we did extend the deadline multiple times. And that was kind of like a cost-saving measure to like not get involved with doctor depositions while this liability issue was out, because we all saw this coming. And so we didn't want to belabor the medical side of it. But yeah, nobody retained actual, like I guess industry standard experts to talk about vessel maintenance and whatnot. We didn't get involved with that. Thank you. Of course, the plaintiff himself noted that scabbed effects, such as the one that occurred here, are very common in barges that are 15 to 20 years old. And that could be viewed, I guess, as evidence that a competent stevedore would know how to proceed in a situation where that was a possibility. Judge, again, I'm out of time with your leave. Oh, please, yeah. And so, yeah, we understand that position of that the competent stevedore should anticipate this kind of defect in the absence of a warning even. We view that as like the type of thing they should anticipate would be like a vessel hazard, such as the vessel's on water and the vessel's moving, you as a competent stevedore know how to handle the movement of the water. And so you're not going to get hurt and complain about us for failing to warn you that the vessel is dangerous when it's in motion, for instance. Whereas this vessel hazard, if he of a defect in the actual construction or maintenance of the vessel, if he's supposed to, I guess, anticipate that, that would essentially mean he has to anticipate any, I guess, problems with the vessel. He didn't actually know about it beforehand. He was told after that this is something that could happen, but it's almost like it would snuggle an assumption of risk defense back into the law. And as we cited in our brief, the Jadranska case, has made that not part of general maritime claims such as this. Thank you so much. Thank you. Let's see what your friend, Mr. Miller. May it please the court, Tom Miller for the Appellee Crouch Corporation. As the trial court noted, no one knows when the flooring weld in question separated or when or how it was deformed into the raised position shown in the post-accident photograph. And both of those facts would be important. In the similar case of Cameron versus Consolidated Grain, this court, following Cyndia, overturned a verdict in favor of a longshoreman whose life jacket caught on a protrusion on a barge's grain doors. And this court cited as a key factor the lack of evidence showing when the damage to the door had occurred. The relevance of this was the resulting lack of any proof that the ship owner should have known of the defect prior to the accident. Now, as in our case here, in Cameron, the barge was in the stevedore's exclusive control at the time of the accident. The barge's owner had it inspected not long before the accident. In Cameron, it was three days. In our case, it was 23 days. No defect was present at the time of the prior inspection. There was no proof that the defect had occurred during towing operations, and the plaintiff offered only his own testimony to show that the protrusion did not occur after the barge's arrival at the stevedore's facility. And so this court found that was not good enough to meet the plaintiff's burden of proof, which is exactly what Chief Judge Pratt found in the present case on a very similar record. Now, I would add that Mr. Smith did not present any expert testimony and did not take discovery from third-party barge cleaner who had done the last prior inspection, from the unloaders at the power plant, the last prior stevedores, or even from Maltzer, his own employer. Instead, Mr. Smith conceded in his summary judgment briefing that the flooring scabbard issue, quote, could have been caused by any number of entities that interacted with the barge at issue, close quote. Under Cameron, this is not enough. Now, if the appellant is suggesting that the mere knowledge that a weld seam could separate at some point from wear and tear is enough to show negligence, this would conflict with the Cameron court's rationale, Ms. Corning and Cameron. And in any event, stevedore knew this was a risk as well as Kraunz did. When was this barge inspected prior to the accident? The last prior inspection where someone is hired to actually look for defects was 23 days prior to the incident. In between there, the barge was in the middle of active operations. It was conducted by the owner of the barge. By a third party hired by the owner of the barge. Hired by the barge. Correct. Does the record show what the industry standard is as to how often these barges should be inspected or does the record show how often this barge was inspected? The record shows how often this barge was inspected. There's no standard of care expert testimony as such. I believe we submitted with our brief testimony from Kraunz's operations manager regarding the typical operations, but neither side presented standard of care testimony as such. In any event, your honor, whoever cleaned the barge was going to have to manage the risk of a potential defect under the cold because the parties had contracted to do it this way. So Kraunz was going to pick up the barge after unloading at the power plant.  a foot high in this case, covering the floor. And then by agreement, Molzer wanted to remove that coal residue before they loaded it with limestone or whatever because they wanted to sell off the coal residue. So if we're gonna do it that way, then Molzer is going to have to look underneath the coal as a stevedore in case something has arisen in the meantime, or better way to put it, they need to accommodate that potential risk as part of their operations. They contracted to do that. Now, so in our case, Kraunz's case is even stronger than the successful vessel owner in Cameron. The Supreme Court's analysis in Syndia makes this latter point clear. And first, a quick reminder of why Syndia exists at all. It's because Congress took the ship owner's strict liability for unseaworthiness out of the statute altogether. So the trade-off now is the longshoreman has a strict liability remedy through his employer via his administrative workers' comp claim under the statute just as Mr. Smith obtained in this case. To get, though, a second remedy from the vessel owner, he now has to show negligence, meaning that proving a defect in the vessel or its equipment is not enough. Indeed, most of these negligence cases do involve the ship owner's equipment with varying results. Now, Congress did not define negligence. So the Supreme Court began to do this in Syndia, which tells us in pertinent part that when turning over the vessel to the stevedore, number one, the ship owner does not have to warn of hazards that would be anticipated by a reasonably competent stevedore. And number two, that applicable law, custom, and contract are to be considered in determining the duties between the parties. If we apply these basic principles here, Maltzler's duty to act with reasonable competence, its regulatory duty under the Code of Federal Regulations to inspect the flooring, and its contract with Krauts to clean the barges to its own satisfaction effectively decided this case. Now, Smith argues that our case involves a hazard under the coal, not slipping on the coal itself, but uncovering the defect, such as by using a broom, or avoiding or accommodating that hazard was an inherent part of this work, as defined by law, custom, and contract. Can you use a broom in a foot of coal? Well, that was done by the hired barge cleaner 23 days prior. You know, you can use the broom first, and then blade with the skid steer, or you can reverse that process. Both, I believe there was testimony that both are sometimes applied. But in any event, there was also testimony from the plaintiff that his employer, the stevedore, had told him to hurry. He was doing between five and eight miles per hour. So these are all things that the stevedore can take into account. If you're engaged in this rough and tumble business, and you can see it from the photograph, then if you're gonna operate a skid steer on that kind of a surface, then you should do so at reasonable speeds, and with reasonably competent practices. Does the record show what, again, is the usual practice? Do you clean the barge after every haul, or was this done simply because you were gonna haul limestone? I wanna be careful to distinguish between my own general knowledge and what was in that deposition. I believe you'll find that Mr. Wayne Crisp's deposition testimony addressed this, and said that the practice was not to clean the barge after every unloading. And I guess it's a distinction between cleaning and inspecting. I guess they're two different things. So inspecting is regular, but certainly not every time. Cleaning, not to the sense of spraying it off to where it's as if nothing's happened, but removing coal residue, I think would be the common practice. It's just that in this case, Maltzer undertook to do that, because they were the seaboarders getting ready to load it. Does the record show who usually cleaned out the barge? Was it another third party, or did the barge owner usually do this? With respect to cleaning, I don't believe I know the answer to that. I think inspecting was normally done by third parties. So if I could address Howlett briefly, because Appellant did, the Supreme Court made clear in Howlett how narrow this turnover duty is with respect to defects in the cargo area. And they did say the cargo stow and cargo area, not just the stow. Is the hopper area of the barge akin to the stow? Yes, as I understand it, the stow would be the product itself. Cargo area on a barge would be the hopper area down on the floor of the barge, where the product is stored. And the Howlett Court's point- You know, forgive me, but the employer contends that Smith was contributory negligent, because he was going too fast as he felt failed. I assume that contributory negligence is disputed. And I was wondering if we need to address the scheme of the skid steer and the misuse of the seatbelt to resolve this case, or do you believe it can be resolved solely by applying Howlett and Cynthia Steen? Both, Your Honor. We cited those points, though, not in support of the contributory negligence argument. I know, I know. But in support of the argument that this is exactly the sort of practice that should be addressed by a reasonably competent stevedore, and that cannot be fairly addressed by the shipowner. What tools they're gonna use and how they're gonna use them, including speed and seatbelts, is just squarely within what the Supreme Court described as the stevedore's duties that the shipowner can reasonably expect the stevedore to undertake. Really, by law and custom, nationally speaking, but in this case, by contract as well. And the court, I'm out of time, Your Honor. I'll stop there. You wanna finish your thought? You may finish your thought. It's just that the Kraunz's tugboat crew could not inspect the cargo hold flooring between the power plant and Mulser since the floor was covered by the very coal residue that Mulser had contracted to clean. Thank you. Thank you. Mr. Cherevick, I'm afraid I'm murdering your name, and I don't mean to. You asked for two minutes, and you're gonna get it, so. Thank you, Judge, and it's fine by my name. That's all right. Just briefly to reply, we didn't understand the 20, the inspection that counsel referred to 23 days before the incident. We didn't understand that to be an inspection. We understood that to be a blade cleaning of the barge, which I think then there's broom cleanings, which are a little more thorough, and that's our understanding of the record anyway. We're not trying to bring unseaworthiness back into the case. My understanding of the facts of Seraki is from 1946, I think. In Seraki, the unseaworthiness remedy was if somebody else's fault, like the stevedore makes the ship unseaworthy, like I guess if Smith's employer had crashed something into the barge and sunk it, and it's unseaworthy, but it's not the vessel owner's fault, that would be like a Seraki-type claim, or in Seraki, actually, it was, I think, a products problem where like a part of the vessel was improperly manufactured, and that was held to be the vessel owner's fault. We can't do that anymore. That's all been abolished, and strict liability is also a matter of, like workers' compensation. If Smith would have tripped over his own feet, for instance, he has a workers' compensation remedy that's strictly liable from his employer, but you don't get a negligence remedy out of that, right? We're not alleging any of that. We're saying that this employer failed to inspect the vessel properly, and therefore discover this defect, failed to warn of the general defect and the specific thing that actually caused the accident. We think that the testimony regarding the inspection that they did do, that this kind of generalized duty that all employees to inspect, we think that that's, in itself, a issue of fact for the jury. We don't think that, so that's, we think that's something that the jury should be allowed to consider, whether they had sufficient inspection and therefore discharged their duty. Same thing with the evidentiary question of whether he can testify about rust or not. We think that that should go to the jury. That's a genuine issue of fact that should foreclose summary judgment. We think either one of those would be sufficient to defeat the motion, but I thank you for your time. And we thank both you and Mr. Miller. We certainly hope that you will feel better soon. And I think it's valiant to do this under these circumstances. And the case will, as all of our cases today, be taken under advisement.